UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.                               Case No. 8:17-cv-

2012 FISKER KARMA, VEHICLE
IDENTIFICATION NUMBER
YH4K16AA1CA000190,

     Defendant.

### VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

In accordance with Rule G(2) of the Supplemental Rules for Admiralty

or Maritime Claims and Asset Forfeiture Actions, Plaintiff United States of

America brings this complaint and alleges upon information and belief as

follows:

### I.     NATURE OF THE ACTION

1.     This is a civil action in rem, to forfeit to the United States of

America, 2012 Fisker Karma with vehicle identification number

YH4K16AA1CA000190, purchased in 2013 by Frank Monte through his

business, Centurion Holdings, Inc. (Defendant Vehicle).

2.     The Defendant Vehicle was seized on October 13, 2016, in

Brooksville, Florida, and is presently in the custody of the United States

Marshals Service.

## II.   <u>VENUE AND JURISDICTION</u>

3.      Venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395, because the property lies within the district. 28 U.S.C. § 1395(b).

4.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345, which provides the Court with jurisdiction over all civil actions commenced by the United States, and pursuant to 28 U.S.C. § 1355, which provides the Court with jurisdiction over actions to recover or enforce forfeitures.

5.      This Court has *in rem* jurisdiction over the Defendant Vehicle because pertinent acts giving rise to the forfeiture occurred in the Middle District of Florida. 28 U.S.C. § 1355(b)(1)(A).

6.      Because the Defendant Vehicle is in the government's possession, custody, and control, the United States requests that this Court issue an arrest warrant *in rem*, upon the filing of the complaint, pursuant to Supplemental Rule G(3)(b)(1). Rule G(3)(b)(i) requires the Clerk to issue a warrant of arrest *in rem* for defendant property if such property is in the government's possession, custody, or control.

7. After the Court issues the warrant of arrest in rem, the United States will execute the warrant pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

## III. STATUTORY BASIS FOR FORFEITURE

8. The Defendant Vehicle is traceable to proceeds of violations of 18 U.S.C. §§ 1347 (healthcare fraud); 1349 (conspiracy to commit health care fraud); and 287 (false claims) and, therefore, is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). Section 981(a)(1)(C) provides for the civil forfeiture of any property, real or personal, which constitutes or is derived from proceeds from any offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offenses.  18 U.S.C. § 981(a)(1)(C).  A "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7)(f) includes any act or activity constituting an offense involving a federal health care offense.

9. Additionally, the monetary transaction made to purchase the Defendant Vehicle was conducted in violation of 18 U.S.C. § 1957(a) because it was knowingly conducted with more than $10,000 in funds derived from specified unlawful activity (specifically offenses involving a federal health care offense), and, as such, it is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

3

# IV.  FACTS

10.    Specific details of the facts and circumstances supporting the forfeiture of the Defendant Vehicle have been provided by FBI Special Agent Deanna M. Clark.  She states as follows:

11.    Agent Clark has been a Special Agent of the Federal Bureau of Investigation (hereinafter "FBI"), in the Tampa (Florida) Field Office for the past 23 years.

12.    Since 2004, Agent Clark has been assigned to the FBI, Tampa Field Office, Lakeland Resident Agency (LRA), where she has conducted white collar crime (WCC) investigations.  Prior to her assignment to the LRA, she was assigned to the FBI Tampa Division's main office currently located in Tampa, Florida.  Agent Clark has conducted numerous criminal investigations of violations of federal criminal statutes involving narcotics, WCC, money laundering, and health care fraud, as well as other federal criminal violations.  During her career, she has obtained and assisted others to obtain seizure warrants, search warrants and arrest warrants.  Additionally, she has experience in investigating individuals who attempt to conceal proceeds of illegal acts, such as mail and wire fraud, including the use of trusts and corporations to disguise the true owner of illicit funds they control through these entities.  Agent Clark has become knowledgeable about the

4

methods and means by which money is laundered and the efforts of persons involved in such activities to avoid detection by law enforcement. As a FBI agent, she has utilized a variety of investigative techniques and resources, including physical and electronic surveillance, undercover operations, and cooperating sources of information, including cooperating defendants.

13. This investigation which led to the seizure of the Defendant Vehicle (the "Investigation") is being conducted jointly by the FBI, Defense Criminal Investigative Service (DCIS), United States Health and Human Services, Office of Inspector General (HHS-OIG), Drug Enforcement Administration (DEA) and United States Air Force Office of Special Investigations (AFOSI). Information obtained as a result of the Investigative effort of each agency is being shared with agents from the other agencies and incorporated into this declaration. The facts set forth in this complaint are based on Agent Clark's own personal knowledge, knowledge she has obtained from law enforcement officers, reviews of documents and computer records related to this investigation, and communications she has had with others who have personal knowledge of the events and circumstances described herein (including participants and information gained through her training and experience and the training and experience of others).

14.     Because this complaint is being submitted for the limited purpose of supporting a civil forfeiture complaint, it does not include each and every fact known to Agent Clark, but only information sufficient to establish reasonable cause to believe that the United States will be able to demonstrate the forfeitability of the Defendant Vehicle at trial.

**A.     Introduction**

15.     The Investigation involves suspected violations of 18 U.S.C. § 1347 (healthcare fraud), 18 U.S.C. § 1349 (conspiracy to commit health care fraud), 18 U.S.C. § 287 (false claims), and 42 U.S.C. § 1320 (payment of kickbacks in connection with a federal healthcare program), among other federal criminal laws, by the principals of Centurion and Oldsmar Pharmacy and Pharmland LLC d/b/a Lifecare Pharmacy (Lifecare).

16.     From an unknown date, but at least in or around 2014, through and including the present, investigation has shown that the individuals operating Oldsmar Pharmacy and Lifecare, together and with the principals of Centurion Holding Inc. (Centurion), agreed to make, made, and are making false claims pertaining to the billing of prescriptions for compounded medications to multiple federal health care programs, including Tricare.

17.     Tricare is the federal health care program for U.S. military members, retirees, and their family members, and is administered by the

DoD's Defense Health Agency (hereinafter "DHA").  Medicare, Medicaid, and Tricare are all Federal health care benefit programs, as defined by 18 U.S.C. § 24(b).

18.     In addition, from an unknown date, but at least in or around 2014, through and including the present, the Investigation has shown that the individuals operating Oldsmar Pharmacy and Lifecare, together and with the principals of Centurion, have committed health care fraud and conspired to commit health care fraud in connection with prescriptions for compounding creams.  The health care fraud scheme included, among other unlawful acts: (1) payment of patients to visit doctors and receive and fill prescriptions for compounding creams regardless of medical necessity; (2) payment of kickbacks by Oldsmar Pharmacy and Lifecare to Centurion; and (3) payment of doctors by Centurion and/or its sales representatives to write prescriptions for compounding creams.

19.     As set forth in more detail below, Lifecare, and then later Oldsmar Pharmacy, employed Centurion as a marketing company. In this role, Centurion would, through sales representatives, procure patients to be seen by physicians, preferably in Centurion's network of doctors. These doctors would in turn prescribe compounding creams. When the pharmacies received payment from the insurance companies (primarily Tricare) on these

prescriptions, they would pay a portion (believed to be 50%) to Centurion, who would pass a portion along to its sales representatives. Centurion had no other source of income besides payment from Lifecare and Oldsmar Pharmacy. Centurion used the funds received from Tricare and other insurance companies to purchase high-end vehicles and other luxury products.

**B.** **Background On Federal Insurance Programs**

**1.** **The Tricare Program**

20.    TRICARE is the federal health care program for uniformed service members (active, Guard/Reserve, retired) and their families around the world. TRICARE is managed by the DHA (formerly the Tricare Management Activity) under leadership of the Assistant Secretary of Defense (Health Affairs). The DHA operates under the authority of the Assistant Secretary of Defense for Health Affairs.  On October 1, 1966, the Civilian Health and Medical Program for the Uniformed Services (CHAMPUS) was established.  CHAMPUS served the military for over 30 years as a cost-sharing program providing health care benefits to military members and their families.

21.    The 1980s saw the launch of CHAMPUS "demonstration" projects like the CHAMPUS Reform Initiative (CRI) in 1988. The CRI was tested in California and Hawaii and offered family members more choices in

regards to their military healthcare benefits.  During the five-year demonstration period CRI operated successfully and yielded high levels of patient satisfaction.  In 1993, the DoD officials and Congress extended and improved the CRI. The new and improved program was renamed "Tricare".

**2.    Review of Tricare Claims**

22.    Agent Clark reviewed Tricare payment data for Lifecare and Oldsmar Pharmacy.  Between on or about January 8, 2014 and on or about January 21, 2015, Tricare paid Lifecare approximately $13.4 million through the EPIC network, a third party pharmacy network that handles payment and administrative processing for smaller pharmacies.  Bank records show that Lifecare paid Centurion approximately $6.7 million on or about the same time period.

23.    Between on or about January, 6, 2014 and on or about March 18, 2015, Tricare paid Oldsmar Pharmacy approximately $39 million.  Bank records show that Oldsmar Pharmacy paid Centurion approximately $19.5 million on or about the same time period. The money paid by Lifecare and Oldsmar Pharmacy was deposited into Centurion bank accounts at Grow Financial Federal Credit Union and JP Morgan Chase.

24.    Witnesses told investigators that Lifecare and Oldsmar Pharmacy paid Centurion approximately 50% of the reimbursements the pharmacies

received from insurance companies. The data reviewed by Agent Clark is consistent with these representations.

### 3.    The Medicare Program

25.    Medicare is a federal insurance program that provides coverage for people 65 and older, people under 65 with certain disabilities, and people of all ages with end-stage renal disease.  Medicare is a health benefit program as defined by 18 U.S.C. § 24(b).  Individuals who receive benefits under Medicare are commonly referred to as Medicare beneficiaries.

26.    The Medicare program is divided into different parts that provide benefits for different areas of medical care.  Medicare Part D provides prescription drug coverage to beneficiaries who opt for this coverage.

27.    In December 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act (MMA), amending the Social Security Act by adding Medicare Part D under Title XVIII.  The MMA allows Medicare payments to insurance plans that contract with Centers for Medicare & Medicaid Services to provide qualified Part D prescription drug coverage to Medicare beneficiaries, as described 42 C.F.R. 423.401. For simplicity in this complaint, the term "Plans" will refer to the private health insurance companies that provide Part D benefits (i.e., prescription coverage) to Medicare beneficiaries.

28.     Plans must submit a summary record called the Prescription Drug Event (PDE) record to Center for Medicare and Medicaid Services (CMS) every time a beneficiary fills a prescription covered under Part D.  The PDE record contains prescription drug cost and payment data that enables CMS to make payments to Plans and otherwise administer the Part D benefit. As a matter of process, when prescriptions are filled, pharmacies submit claims to the Plans. Generally, these claims are submitted electronically to the Plans.  Once these claims are adjudicated, the Plans pay the pharmacies for providing the Part D benefits to qualified Medicare beneficiaries. The Plans then reconcile with (or seek reimbursement from) CMS through the submission of the PDE records.

29.     Oldsmar Pharmacy and Lifecare both submitted Medicare Part D claims to various Medicare Part D plans for Medicare Beneficiaries that fill their prescriptions at their pharmacy.

**4.     Review of Medicare Part D and Medicaid Claims**

30.     A review of Medicare Part D claims data indicated Oldsmar Pharmacy submitted claims to various Medicare Part D Plans from on or about January 1, 2014, to the present.  The total amount paid by various Medicare Part D Plans to Oldsmar Pharmacy was approximately $50,000.

31.     A review of Medicare claims data indicates that Lifecare submitted claims to various Medicare Part D Plans from on or about January 1, 2014, to the present.  The total amount paid by various Part D Plans to Lifecare was approximately $1.4 million.

**C.     Probable Cause**

**1.     Centurion's Business Was Marketing Compounding Creams for Lifecare and Oldsmar Pharmacies**

32.     According to the Florida Department of State, Division of Corporations, and other publicly available records, Centurion Compounding, Inc. was a Florida Profit Corporation, located at 2634 Cypress Ridge Blvd Suite 101, Wesley Chapel, FL 33544.  The President and Registered Agent of Centurion Compounding Inc. is Centurion Holding Inc., with the same mailing address.  Centurion Holding, Inc. was registered with the State of Florida on or about August 1, 2012.  The President of Centurion Holding Inc. is Frank V. Monte, 27616 Sora Blvd., Wesley Chapel, FL 33544.  The listed Vice President of Centurion Holding Inc. is Kimberley Anderson and the Treasurer is Robert Anderson, a husband and wife who resided at 2032 Florida Street, Valrico, FL 33594.

33.     According to the records of the Florida Department of State, Division of Corporations, and other publicly available records, Z-Stat Medical is a Florida Limited Liability Corporation, with a principal address of 34911

US Highway 19 North, Suite 525A, Palm Harbor, FL 34864.  According to

the Florida Department of Health, Z-Stat Medical, Pharmacy License Number

PH24852, was doing business at that address under the name of Oldsmar

Pharmacy.  According to State of Florida records, the registered agent for Z-

Stat Medical is Stat Direct, LLC, whose managing member is listed as Larry

E. Smith.  Z-Stat Medical was formed on or about July 21, 2010.

34.     Centurion is, in fact, a marketing firm that neither fills

prescriptions nor bills federal health care programs, including Tricare.

According to Centurion's own marketing materials, it "is engaged in the

business of marketing pharmaceutical personal care and healthcare products

to medical practitioners and/or consumers."

35.     Starting on or about December 3, 2014, Agent Clark received

information that Centurion actively employs independent sales/marketing

representatives who recruit patients with acceptable insurance coverage, to

include Tricare and Medicare plans.  The Centurion sales/marketing

representatives then deliver these patients to physicians, who participate in

the supposed "Centurion Network," as described by Centurion sales

representatives.  These physicians complete the Centurion-generated

prescription forms and choose which compounded medication(s) the patient

is to receive.  These forms have boxes for the physician to choose certain compounded creams, including pain relief creams and scar creams.  A single tube of premium scar deluxe cream, which is marketed by Centurion and prescribed by its "in-network" doctors, is reimbursed by Tricare at approximately $17,000 for a single tube that is roughly the size of a tube of toothpaste.  Another cream offered on Centurion's prescription form, called "neuromax" chronic pain cream, is reimbursed by Tricare at approximately $4,500 for a single tube that is roughly the size of a tube of toothpaste.  In both cases, a single tube is supposed to be a 20-30 day supply of the compounded medication.

36.     The prescription forms generated by Centurion and filled out by a Centurion "in-network" physician are faxed to Oldsmar Pharmacy, where they are filled.  Oldsmar Pharmacy has been working in this manner since at least in or around January 2014.  Claims data and other information also show that Oldsmar Pharmacy operated concurrently with, and subsequently inherited patients from, the now-closed Lifecare, which was located in Pinellas County and similarly affiliated with Centurion until it closed in or around November 2014.

37.     Once Oldsmar Pharmacy receives the prescription forms related to Centurion, their onsite pharmacist reviews them to verify the patients,

addresses, medications, providers, etc.  Oldsmar Pharmacy has a central fill agreement with APS Pharmacy for all compounding medication.  Therefore, Oldsmar Pharmacy submits the compounding prescriptions to the APS to be filled.  Once APS Pharmacy has filled them, they send them back to Oldsmar Pharmacy.  The onsite pharmacy again reviews the compounding prescriptions, and they are shipped to the beneficiaries.  Oldsmar Pharmacy then submits the claims for payment to the federal health care programs providing insurance to the beneficiaries, often Tricare.  In many cases, beneficiaries have no medical need for these creams and are recruited to see "in-network" doctors by Centurion sales representatives regardless of medical necessity.

38.    The prescription forms generated by Centurion and used by its sales reps have a number on the bottom right corner.  This number is unique to each sales representative.  When Oldsmar Pharmacy fills the prescriptions and receives payment from the health benefit program, including Tricare, the sales representative responsible for bringing that beneficiary's prescription to the pharmacy receives a percentage of Oldsmar's reimbursement amount directly from Centurion.  This percentage varies by sales representative depending on the representative's volume of sales.  According to one copy of

Centurion's marketing materials, the "Marketer will be compensated 15% of the total reimbursement for each insurance approved ... minus the cost of drug(s), paid to Centurion Compounding.  Commissions will be paid only after payment is received from the associated pharmacy …"

39.    Centurion's sales representatives pay one or more "in network" physicians kickbacks for prescribing the compounded creams on the Centurion-generated prescription form and that Centurion has a kickback relationship with a specific doctor, A.B., who to date has prescribed creams using Centurion's generated forms and billed to Tricare for reimbursement in excess of $9 million.

### 2.    Complaints and Disclosures to Law Enforcement and Regulators

40.    In or around early December 2014, the FBI received information from "Witness A" who claimed to work for Centurion and its president, Frank Monte.  Witness A told the FBI that Centurion was a nationwide marketing company and that it was marketing for a company called Family Life Care. Witness A advised that a participating physician within the Centurion network would prescribe creams to his patients who did not require the cream. Witness A further stated that this physician, later identified as A.B., then received a "kickback" for every cream he prescribed.  Witness A said that

when he/she began asking questions at Centurion about this particular physician, Frank Monte and Centurion Vice President Kimberley Anderson called Witness A into a meeting, made him/her turn off his/her cell phone, and said if Witness A ever threatened the company again, they would kill Witness A and his/her family.  Witness A was interviewed again on or about January 20, 2015, during which he/she downplayed the seriousness of this threat.  In fact, Witness A continued to work for Centurion after this threat.

41.     Separately, on or about December 24, 2014, the State of Florida Office of the Attorney General received an anonymous complaint reporting "what may be a Medical Insurance Fraud Scam of $20,000,000 to $30,000,000 monthly and what I know for certain is a medical fraud and conspiracy by 3 or 4 to steal $1,000,000 to $2,000,000 per month and that is rising rapidly."  The anonymous author identified Lifecare Pharmacy and Centurion as the companies involved.  The author identified Frank Monte as Centurion's principal, who, according to the complainant, employs approximately 1,500 independent sales agents to directly sell compounded medicated creams to patients.  The anonymous complaint alleged that Lifecare would bill the federal health care program and keep 60% of the claim total, forwarding 40% via wire transfer to Centurion.  The Centurion sales representative then

received between 15-25% of the cost of the claim, with the sales

representative's team leader also receiving a portion of each sales

representative's commission.  The anonymous complainant also claimed

many patients received kickback payments from the sales representatives in

exchange for allowing their personally identifying information to be used to

fraudulently bill the federal health care programs.

42.     On or about December 30, 2014, Lifecare in Pinellas County,

Florida filed a self-disclosure with the Department of Health and Human

Services Office of the Inspector General (hereinafter "HHSOIG"), wherein

Pharmland LLC disclosed Lifecare Pharmacy's relationship with Centurion,

referred to throughout the disclosure as Lifecare's "Marketing company."  The

self-disclosure related in part that, "Lifecare entered a marketing services

agreement ('Agreement') with Centurion Holdings, Inc. d/b/a Centurion

Compounding ('Marketing Company') on or around May 2, 2014, for certain

marketing services to be provided to LifeCare by Marketing Company and its

sales representatives. The Agreement provided for the following percentage

based compensation methodology to Marketing Company in consideration for

the marketing services: 'Subject to all of the terms and conditions of this

Agreement, Finder is eligible to earn a referral fee (the "Referral Fee") equal

to fifty percent (50%) of the Insurance Compensation with respect to all new

Matters and/or procuring cause Matters that Finder Originates for LifeCare.'"

In addition, the Agreement provides:

> Specific to this disclosure to the OIG, LifeCare believes
> that (i) it may have made percentage-based payments to
> the Marketing Company for its marketing services, and (ii)
> Marketing Company may have inadvertently utilized
> LifeCare compensation dollars for the payment of
> commissions to Representatives for prescriptions that were
> ultimately reimbursable by Medicare. Upon becoming
> aware of the foregoing, LifeCare has ceased the payment
> of *any and all* commissions on marketing services to
> Marketing Company.

> According to this letter, Lifecare, by their own admission
> may have violated federal and state Anti-Kickback laws by
> causing reimbursement from Medicare Part D claims that
> was used by Centurion to pay for their sales
> representatives.

43.     On or about January 9, 2015, a representative from the DHA

provided information that Oldsmar Pharmacy and Lifecare were affiliated

with Centurion and that Oldsmar Pharmacy had taken over filling

prescriptions for Tricare beneficiaries from Lifecare as of in or around

December 2014.  A DHA investigator found a listing on Craislist.org

soliciting Tricare patients to a Centurion sales representative who, when

contacted, directed the DHA investigator directly to the Oldsmar Pharmacy

website to order prescription medication, specifically compounded creams.

The Centurion sales representative also provided the DHA investigator with

a blank Centurion prescription form to order the cream(s).  Another DHA

representative related that a Tricare beneficiary advised the DHA that

Oldsmar Pharmacy, upon taking over the filling of his or her Tricare claims,

agreed to waive all copayments for compounded medication prescriptions.

This is not allowed under Tricare's regulations and cost-sharing agreements

with their providers.

44.     On or about January 16, 2015, Special Agents from HHS-OIG

interviewed "Witness B" regarding practices and procedures at Centurion.

Witness B, who previously worked at Centurion, had contacted HHS-OIG to

provide information, claiming in a hotline complaint that Centurion "is

paying kickbacks to the doctors and to patients for using compounding drugs

from the pharmacy.  They are also getting patients to get prescriptions that

they do not necessarily need from doctors that they pay so they can get

payment from their insurance company…"  Witness B said Frank Monte

informed him/her that Centurion was paying Dr. A.B. to write compounding

prescriptions, and that the only way Dr. A.B. would write the prescriptions

was if Centurion paid him.  Witness B stated Centurion marketing reps would

drive patients to Dr. A.B.'s office in order to obtain the prescriptions.  Witness

B said the marketing representatives are being paid by Centurion and in turn,

the representatives pay the patients for allowing their information to be used in

billing the federal health care programs.  Witness B stated Centurion receives a

percentage of all claims billed to the federal health care programs by the pharmacy and that the sales representatives then receive 80% of Centurion's share.  Witness B also corroborated that APS Pharmacy, previously located at the same location as Oldsmar Pharmacy, was also paying physicians for writing prescriptions and paying sales representatives who in turn pay patients.

45.     Witness B was re-interviewed by FBI and HHS-OIG agents on or about February 5, 2015.  Witness B reiterated the same information in the original complaint with more detail.  Such information included the following:

a.     Witness B provided information about Centurion from its inception in or around early 2014, until in or around August 2014.

b.     Witness B stated that Centurion started with Frank Monte, Kim Anderson and Yvette Pinson, another principal and sales representative from Centurion.  The two owners were Anderson and Monte, and Pinson was an associate. Through friends, Monte met an individual named "CM,"[1] who was a pharmacist at Lifecare.  Monte and CM formed an informal arrangement between Centurion and Lifecare.

c.     The Centurion principals then mainly recruited sales representatives from their informal groups of friends and associates in

_____

[1] Lifecare's self-disclosure identifies CM as the owner of Lifecare pharmacy and Florida wage and hour records show that CM received income from Pharmland LLC d/b/a Lifecare pharmacy through the third quarter of 2014.

Hillsborough, Pinellas and Pasco Counties.  Once recruited, sales representatives signed a marketing and confidentiality agreement with Centurion and attended training sessions conducted by Monte and others. Among other things, Monte created a marketing video to recruit sales representatives, entitled the "Wolf of Wesley Chapel," for which Monte paid approximately $30,000.  *See* https://vimeo.com/tag:the+wolf+of+wesley+chapel.  The video features displays of wealth by the seven primary employees of Centurion, including luxury cars and jewelry.

      d.     Monte recommended all the sales reps form LLCs to receive commission payments.

      e.     Witness B also stated that Monte and others worked to recruit "in network" doctors who would prescribe the compounded creams. During a conversation, Witness B was told by Monte that they could not pay doctors, specifically Dr. A.B., to write prescriptions because that was "illegal."

      f.     Later, Monte met Dr. A.B. at a housewarming party thrown by Lifecare pharmacist C.M.  Monte told Witness B that he had to pay Dr. A.B. because it was the only way he would "do it."

      g.     Witness B knew of one other "preferred" or "in-network" doctor used by Centurion, Dr. B.F.

h.      Witness B described that Centurion's sales force is, in essence, based upon a multilevel marketing model.

i.      Witness B stated that Monte created the insurance information and prescription forms used by the doctors to order the compounding creams and relied on C.M. to run "test files" to see if the various insurance companies covered the compounds.  He/she knows this because C.M. told Witness B during a business dinner.  At another time, C.M. told him/her that he got paid by submitting the claims to the insurance company and then paid Centurion a percentage.

j.      Witness B saw large, bulk payments, at least one of which was approximately $500,000, from the pharmacy to Centurion, and Centurion used these funds to pay its employees and sales representatives via their LLCs, in most cases.  Witness B never saw any payments to Dr. A.B. or Dr. B.F.

k.      Witness B related that all the payments were electronic. Centurion purportedly has an online portal where sales reps can log in and check their sales numbers, commissions, and other information.

l.      Witness B said that the principals and sales people of Centurion "targeted veterans," and that C.M., who was the most familiar with billing insurance companies, said "Tricare would cover anything."

### 3.      AFOSI Investigation of Sales Representative

46.      On or about January 28, 2015, Agent Clark was contacted by an AFOSI Special Agent assigned to MacDill Air Force Base in Tampa, Florida. The AFOSI agent related that on or about January 27, 2015, AFOSI was contacted by an active duty Air Force Confidential Informant (hereinafter CI-1) who claimed that a fellow active duty airman (hereinafter "Rep-A") solicited CI-1 to obtain prescription medication to support his off-duty employment.  Rep-A provided CI-1 the details of "Rep A's" employment with a marketing company identified as Centurion Compounding.  CI-1 advised AFOSI that Rep-A said he was a sales representative for Centurion and recruited Tricare beneficiaries as his customers.  Rep-A explained to CI-1 that his customers would visit a select doctor's office to meet with one of the doctors within his network of providers.  Rep-A provided to CI-1 the addresses of approximately three doctor's clinics within the Centurion "network" of providers, one of which is where Dr. A.B. sees patients.

47.      Rep-A explained to CI-1 that he/she should visit one of these doctors during non-MacDill Air Force Base clinic hours so they would not require a Tricare referral and that Rep-A would pay the doctor's visit fee if there was one.  Rep-A stated he was not allowed to pay the doctor himself but would need to give CI-1 the money to pay.  Rep-A explained that paying

directly for the doctor's office visit, rather than the doctor billing Tricare, would minimize any suspicion from Tricare. Once at the doctor's office, Rep-A told CI-1 that he/she would be seen by the doctor who would prescribe a compound prescription. Once the prescription was filled, Tricare would be billed. Rep-A told CI-1 he (Rep-A) received 15% of the total amount that Tricare paid per prescription. Most of this information was related to AFOSI after the conversations occurred between Rep-A and CI-1 but were corroborated by text messages between Rep-A and CI-1 provided to AFOSI.

48.     On or about January 28, 2015, Rep-A met CI-1, under observation by law enforcement. Rep-A provided CI-1 with an unused Centurion prescription document to take to one of the clinics within his "network." "Rep A" informed CI-1 that if CI-1 did not have time to visit one of the clinics, CI-1 could contact a "teledoctor," which Rep-A explained was where CI-1 and Rep-A or just CI-1 alone could video conference a doctor using Apple's Facetime application or Skype. When asked by CI-1 if a patient needed to have symptoms or ailments to get a prescription, Rep-A stated "no" and that the doctors were "lenient." A review of the prescription form provided by Rep-A to CI-I displayed Centurion Compounding letter head, listed multiple compounded medications for various ailments, and disclosed which insurance providers would likely not pay for the compounds. Tricare is

*not* listed as one of the insurance providers that would refuse to pay for the compounds.  The bottom right of the prescription form listed the code CENT 2634-1084.  The Investigation determined that 1084 was "Rep-A's" assigned Centurion sales representative number that allowed Centurion and its partner pharmacies to track "Rep A's" sales volume and commissions.

49.    AFOSI identified seven active members of the U.S. Air Force who are assigned to the same unit as Rep-A and who have claims for compounded creams made to Tricare on their behalf by both Lifecare and Oldsmar Pharmacy.  Tricare claims data shows payments to Oldsmar Pharmacy for six of these seven individuals totaling more than $122,642. Tricare claims data for these same seven individuals includes an additional $105,680 that was paid for claims submitted by Lifecare pharmacy.

50.    Rep-A has also had prescriptions filled in both his name and the name of one of his family members from in or around September 2014, through in or around December 30, 2014.  The 17 different pharmacy claims made for Rep-A and his family member resulted in $101,954.09 in payments by Tricare to the pharmacies.  Six of the 17 prescriptions were filled and billed to Tricare by Lifecare Pharmacy.  Three of the Lifecare claims were made on or about September 29, 2014, and three others were made on or about November 3, 2014. The other 11 claims listing Rep-A and/or his family

member as the beneficiary were claimed and billed to Tricare by Oldsmar

Pharmacy, with various dates including on or about November 24, December

15, 29, and 30, 2014.  Fourteen of the 17 claims paid by Tricare for

medications for Rep-A and/or his family member were prescriptions written

by Dr. A.B.

### 4.    February 10, 2015 Search

51.    Based upon the foregoing and other information, investigators

obtained search warrants for Centurion and Oldsmar Pharmacy on or about

February 6, 2015, case no. 8:15-mj-1094 AEP. Agents executed the warrant on

or about February 10, 2015.  Documents found in the search warrant

included Marketing Representative Agreements.  The parties to the contracts

included Centurion Compounding and Marketing

Representatives/Independent Contractor.  Paragraph G in said agreement is

entitled "Marketing Fees & Taxes."  This paragraph outlines the

compensation paid to the Marketer.  It specifically states, "The Marketer will

be compensated 15% of the total reimbursement for each insurance

approved, and adjudicated by any associated pharmacy, minus cost of

drug(s), paid to Centurion Compounding (defined as Net Reimbursement).

Commissions will be paid ***only after payment is received from the associated***

*pharmacy* and will be EFT (Electronic Funds Transfer) to marketers chosen

financial institution within 15 days."  (emphasis added).

52.     Copies of prescriptions were also found at the search site from

Lifecare Pharmacy and Oldsmar Pharmacy.  Based on the documentary

evidence found at the search sited, interviews, and financial records, the only

two known "associated" pharmacies of Centurion were Lifecare Pharmacy

and Oldsmar Pharmacy.

## V.   TRACING OF SUBJECT PROPERTY TO PROCEEDS OF HEALTH CARE FRAUD SCHEME

53.     The purchase of the Defendant Vehicle was funded from Grow

Financial Federal Credit Union account number ending in 3963 (Grow

Account 3963). The account, opened on or about July 31, 2012, was originally

titled to Centurion Financial, a financial assistance company held by Frank V.

Monte, but was changed to Centurion Holding, Inc. on or about May 28,

2014.  Frank V. Monte and Kimberley Sue Anderson are co-signers on the

account.

54.     Investigators reviewed the account activity between on or about

May 15, 2014, to on or about November 4, 2014, the date on which the

account was closed.  The opening balance on May 15, 2014, was $10,684.97.

Credits to the account during this period totaled $4,037,796.[2]

55.    Of those total credits, approximately $3,936,478 (97%), consisted of eight wire transfers, ranging from $39,269 to $1,484,829, originating from Pharmland LLC, Florida Bank account xxxxx1601.  As discussed above, Pharmland LLC is the legal business name for Lifecare. All of the payments made by Lifecare to Centurion were payments for marketing of compounding creams and are considered proceeds of the healthcare fraud. The remaining credits, totaling approximately $101,317, primarily consisted of a $10,000 cash deposit and refunds and payments from various vendors.

56.    One of the eight wire transfers received from Pharmland LLC was a $1,113,125.15 wire transfer deposited to Grow Account 3963 on September 15, 2014.   There were no other deposits that day to Grow Account 3963. Withdrawals and debits from the account on September 15, 2014, totaled $328,230.05.  On September 16, 2014, $61,276.91 was withdrawn from the account and used to fund a wire transfer, in the same amount, to the Fifth Third Bank account of Autos Direct Online.  Noted in the reference section of the wire transfer was "VIN# YH4K16AA1CA000190."  Research determined

---

[2]  Excluded from this total was a $2,062,568 wire transfer from Pharmland LLC, which was received and returned by Grow Financial on October 15, 2014.  A wire transfer from Pharmland LLC for this same amount was sent on October 16, 2014 to another account maintained by Centurion Holding, Inc. at JP Morgan Chase Bank.

that this vehicle identification number was assigned to the Defendant

Vehicle -- the 2012 Fisker Karma.

57.     The source of the funding for the $61,276.91 transfer for the

Defendant Vehicle was traced using the Last-In First-Out (LIFO) accounting

concept of tracing funds.[3]  Using LIFO, it was determined that the transfer

was entirely funded with proceeds from the health care fraud.

58.     No record could be located for the Defendant Vehicle's

subsequent registration in the state of Florida following the September 16,

2014 wire transfer.

59.     On August 30, 2016, the Office of the Ohio Attorney General

provided copies of documentation submitted to their office by Frank Monte

concerning the purchase and registration of the Defendant Vehicle.  According

to the Office of the Ohio Attorney General, Monte filed a complaint with their

office regarding the dealer's (Autos Direct Online) failure to deliver title to the

Defendant Vehicle.  Documents provided by Frank Monte to support his

claim included the following:

---

[3] The LIFO accounting concept is an approach used to calculate which funds are
subject to forfeiture in an account containing both tainted and non-tainted funds.
The LIFO concept posits that withdrawals from the account are first funded by the
deposit that immediately preceded it. In the event there are insufficient funds to fund
that withdrawal, the next preceding deposit is drawn from.

a.     A notarized affidavit, dated January 21, 2015, prepared by Frank Monte, stating that he purchased the Defendant Vehicle from Autos Direct Online, located in Cleveland, Ohio, with the $61,276.91 wire transfer sent on September 16, 2014, and subsequently received a temporary Ohio registration that expired on October 25, 2014.  He further stated that subsequent to receiving the Defendant Vehicle it was determined that the odometer had been tampered with, which precluded him from being able to register the vehicle in the state of Florida.

b.     Ohio state temporary registration application for the Defendant Vehicle, showing temporary tag A063848 was issued to Centurion Holdings, Inc. on September 25, 2014.

c.     An email, dated September 27, 2014, from Frank Monte to Steve at Autos Direct Online indicating that Monte received the Defendant Vehicle that day.

60.     The Ohio Attorney General's Office clarified that the title issue with the Defendant Vehicle stemmed from the fact that the dealer failed to pay off its floor plan financier [4],  NextGear Capital, after receiving full payment

---

[4] "Floor plan financing" is a type of short term loan used in the automobile industry. It is a revolving line of credit that allows the borrower/dealer to obtain financing to purchase automobiles.  When each automobile is sold by the dealer, the loan advance against that piece of collateral is repaid.

from Monte for the Defendant Vehicle.  As a result, NextGear Capital would

not release title to the Defendant Vehicle.  NextGear Capital recently

confirmed, however, that title for the Defendant Vehicle was released to

Monte in early September 2016.  Monte did not retitle the Defendant Vehicle

prior to its seizure; however, NextGear Capital confirmed that it has released

its lien based on documentation provided by Monte which confirmed that he

paid Autos Direct Online in full.

61.     Because the Defendant Vehicle was purchased with $61,276.91

in proceeds obtained from the healthcare fraud scheme, the Defendant Vehicle

is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

62.     Additionally, the monetary transaction made to purchase the

Defendant Vehicle was conducted in violation of 18 U.S.C. § 1957(a) because

the purchase of the Defendant Vehicle involved a monetary transaction

knowingly conducted with more than $10,000.00 in criminally derived funds

and, as such, the Defendant Vehicle is subject to civil forfeiture pursuant to 18

U.S.C. § 981(a)(1)(A).

63.     Based on the foregoing, there is probable cause to believe that the

Defendant Vehicle is subject to forfeiture as property that was (1) purchased

with proceeds from Centurion Holding, Inc.'s health care fraud scheme,

committed in violation of 18 U.S.C. § 1347 (health care fraud), 18 U.S.C.

§ 1349 (conspiracy to commit health care fraud), 18 U.S.C. § 287 (false claims), and 42 U.S.C. § 1320 (payment of kickbacks in connection with a federal health care program), among other federal criminal laws and (2) involved in a financial transaction involving more than $10,000 in health care fraud proceeds, conducted in violation of 18 U.S.C. § 1957.

## VI.   **CONCLUSION**

64.    As required by Supplemental Rule G(2)(f), the facts set forth herein support a reasonable belief that the government will be able to meet its burden of proof at trial. Specifically, they support a reasonable belief that the government will be able to show by a preponderance of the evidence that the Defendant Vehicle is derived from proceeds of health care fraud, conspiracy to commit heath care fraud, and false claims.

WHEREFORE, pursuant to Supplemental Rule G, Plaintiff United States of America requests that this Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b)(1) for the Defendant Vehicle, initiate a process of forfeiture against the Defendant Vehicle, and duly notice all interested parties to appear and show cause why the forfeiture should not be decreed. The United States further requests the Court order the Defendant

Vehicle forfeited to the United States for disposition according to law and

grant the United States such other and further relief as this case may require.

Dated: February _8_, 2017

Respectfully submitted,

A. LEE BENTLEY, III,
United States Attorney

By: _____

SUZANNE C. NEBESKY
Assistant United States Attorney
Florida Bar No. 59377
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone: (813) 274-6000
Facsimile: (813) 274-6220
E-mail: suzanne.nebesky@usdoj.gov

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Deanna Clark, declare under penalty of perjury that:

I am a Special Agent with the Federal Bureau of Investigation. I have read the foregoing Verified Complaint for Forfeiture *in Rem* and have personal knowledge that the matters alleged as fact in the Complaint are true.

I have acquired my knowledge in this matter through my personal experience, observation, investigation, and training, and from witnesses, records, and other law enforcement officers.

Executed this 8th day of February, 2017.

Deanna Clark

Deanna Clark, Special Agent
Federal Bureau of Investigation,

35